OPINION OF THE COURT
Frank J. Bárbaro, J.
Defendant was indicted on various weapons possession offenses after a search or frisk of his person inside the Dean’s office of Sheepshead Bay High School uncovered a loaded handgun. Defendant subsequently moved to suppress the handgun and to suppress three statements — one of which was made in response to questioning by the High School’s Dean and two of which were made in response to questioning by police and school safety officers. A Mapp/Huntley hearing was held on April 10, 2001, after which this Court granted that portion of defendant’s Huntley motion which sought suppression of defendant’s statements to the officers, but denied defendant’s *50 motions in all other respects. This opinion explains in more detail the Court’s reasons for its April 10 ruling.
Findings of Fact
The only witness to testify at the April 10 hearing was Glenn Coyle, a school safety officer employed by the New York City Police Department and assigned to Sheepshead Bay High School.[1] Coyle testified that on September 12, 2000, at approximately 1:15 p.m., just after he and a fellow school safety officer, Sergeant Thompson, finished clearing out the school cafeteria, he saw defendant standing in the lobby wearing a grey bandana or headband around his head and a blue bandana around his wrist. According to Coyle, such headgear was prohibited by the Chancellor’s rules, which were posted in the school cafeteria and other places, because it is sometimes a sign of gang affiliation. There were no such rules relating to wristbands or bandanas not worn on the head, but Coyle knew from his nine years on the job that such bandanas were also sometimes gang symbols. Accordingly, Coyle approached defendant and asked him to remove both the headgear and the blue bandana. Defendant complied.
Because Coyle did not recognize defendant, the officer asked whether defendant was a student. Defendant replied that he was, but claimed — plausibly, according to Coyle — that he had finished his classes for the day. Coyle then asked to see defendant’s “program card” — a form of identification giving a student’s name, classes and teachers but not bearing any photograph or description of the student or some other form of identification. In response, defendant stated that he was about to leave, but could not produce a program card. Defendant did not produce any other form of identification and did not give Coyle his name.
Sergeant Thompson then requested that defendant accompany them to the Dean’s office, which was located nearby on the same floor, and defendant agreed to do so. While escorting defendant to the Dean’s office, Coyle and Thompson encountered two other young men. One, with a bandana obscuring the lower half of his face, approached Coyle in what the officer perceived to be a threatening manner. This man was asked for his program card, and produced one bearing the name Kenmar Butler. Coyle did not return the card, but asked that *51 student also to accompany him to the Dean’s office. Although the student initially complied, he fled before reaching the Dean’s office. Coyle radioed a description of the fleeing student, but made no effort to pursue him.
In a cubicle at the Dean’s office, defendant was questioned by Dean Findling — the faculty member in charge of discipline at the school — in the presence of Coyle, Sergeant Thompson and another school safety officer, Officer Frederick. Defendant claimed that he was a new student who had transferred from Madison High School, and was able to give accurate information regarding that school. However, defendant could not name any of the guidance counselors or teachers at Sheepshead Bay High School. He was able to produce a program card bearing the name Kenmar Butler, which proved identical to the one which Coyle had confiscated from the student that had fled from him. Defendant claimed that he was Kenmar but, although defendant knew Kenmar’s date of birth, he did not know other details concerning Kenmar. Defendant also claimed that he had no other identification.
At the hearing, Coyle explained that persons entering the school were required to present identification. Persons entering the school through the usual entrances must pass through security checkpoints at which they must show identification and pass through a security scanner. Although visitors to the school are often admitted, school policy requires that anyone without identification be sent to the Dean’s office so that their identity may be determined. Since defendant had no identification other than the duplicate program card, the Deem asked the officers to “search” defendant, then left the cubicle to make some telephone calls.
Coyle patted down the defendant. Feeling a hard object which created a bulge in the pocket of defendant’s jacket, Coyle reached into the pocket and pulled out a black handgun. Defendant was immediately handcuffed. A further search revealed that defendant had a picture identification card from Madison High School, identifying him as Jameel Butler. Defendant then asked to be let go, but he remained handcuffed.
At some point thereafter, Dean Findling re-entered the room. Walking directly up to the defendant, he said, “I’m going to ask you once and only once and I want the truth. Is it loaded?” Defendant responded, “Yes.” Shortly thereafter, a regular duty officer from the 61st Precinct entered and asked where defendant had obtained the weapon, to which defendant responded that he had found it on the street and was carrying it for *52 protection. Sergeant Thompson also asked defendant how he had entered the school building, to which defendant replied that he had come in through a side door. Coyle admitted that neither he nor anyone else ever read defendant his Miranda rights, but denied that they had in any way threatened or coerced the defendant.
At oral argument, defense counsel argued that defendant had essentially been arrested for failure to present proper identification and that the school safety officers acted unreasonably in requesting that he accompany them to the Dean’s office rather than simply asking the defendant to leave the building. He further argued that because of the close working relationship between the Dean and the officers, the Dean was effectively an agent of the police when he questioned defendant.
The prosecution conceded that the two statements made to the police officers were in violation of the defendant’s Miranda rights and should be suppressed, but maintained that the Dean had acted as a private party in questioning defendant. The prosecutor also refuted the defendant’s assertion of a Mapp violation, arguing that the defendant had voluntarily accompanied the officers to the Dean’s office and that the officers had acted reasonably upon suspecting that the defendant had trespassed in the school. However, like defense counsel before him, the prosecutor analyzed the facts as if this had been a street encounter, and did not discuss the legal standards applicable where the encounter takes place inside a school.
Conclusions of Law
In my view, both parties are making the mistake of analyzing this in-school encounter between a school safety officer and defendant, who professed to be a student, as the functional equivalent of an encounter between a police officer and a private citizen. Indeed, at oral argument, defense counsel went so far as to say that there were only “subtle differences” between the search and seizure standards applicable inside schools and those applicable to street encounters. This is simply not the case.
Defense counsel is, of course, correct in noting that the Fourth Amendment operates to protect students inside school premises from unreasonable searches and seizures (New Jersey v T.L.O., 469 US 325; Matter of Gregory M., 82 NY2d 588, 592). However, determining the reasonableness of a search or seizure involves “balancing of basic personal rights against urgent social necessities” (Matter of Gregory M., supra, at 592, quoting People v Scott D., 34 NY2d 483, 488). Courts have *53 recognized that “[a] school is a special kind of place in which serious and dangerous wrongdoing is intolerable” (People v Scott D., supra, at 486). Accordingly, in performing that balancing, the Court has held that the “prevention of the introduction of hand guns and other lethal weapons into New York City schools such as this high school is a governmental interest of the highest urgency5’ (Matter of Gregory M., supra, at 593). On the other hand, the Court has noted that “[yloungsters in a school, for their own sake, as well as that of their age peers in the school, may not be treated with the same circumspection required outside the school or to which self-sufficient adults are entitled55 (People v Scott D., supra, at 486-487).
Schools have a very different relationship to their students than police officers have to the private citizens they encounter on the street. Attendance is mandatory, and those required to attend must attend “regularly as prescribed where [the student] resides or is employed, for the entire time the appropriate public schools or classes are in session and * * * be subordinate and orderly while attending55 (Education Law § 3210 [1] [a]). In assuming physical custody and control over its students, a school stands in loco parentis; it has the duty to “exercise such care of them as a parent of ordinary prudence would observe in comparable circumstances.” (Mirand v City of New York, 84 NY2d 44, 49; Hoose v Drumm, 281 NY 54, 57-58.) Schools have a duty to adequately supervise the students in their charge and may be held liable for foreseeable injuries proximately related to the absence of adequate supervision (Mirand v City of New York, supra, at 49; see, e.g., Lawes v Board of Educ., 16 NY2d 302, 306). To that end, a school may discipline a student. However, such discipline is governed by myriad statutes, regulations and district policies dictating such details as the permissible disciplinary action, the due process to be afforded the student and parent, and the person authorized to impose the discipline. For example, Education Law § 3214 (3) (a) provides that only “[t]he board of education, board of trustees or sole trustee, the superintendent of schools, district superintendent of schools or principal of a school may suspend * * * pupils from required attendance upon instruction,55 and even then under certain circumstances and after according them and their parents the due process rights set forth in that section.
In light of the foregoing, this Court concludes that Officer Coyle acted entirely appropriately in questioning defendant and escorting him to the Dean’s office. First, even defense *54 counsel conceded that the school safety officers would have the right to approach someone who looked like a student and ask him for his identification card. When defendant answered Coyle’s questions by professing to be a student, but could not prove it by producing a program card, Coyle acted reasonably in asking defendant to accompany him to the Dean’s office (see People v Dorner, 116 Misc 2d 1087). Indeed, Coyle had virtually no other choice. He could not, as defense counsel suggested, simply order him to leave the building. If defendant had actually been a student who had not finished his classes for the day — and Coyle had no evidence conclusively proving the contrary — an order to leave would have exposed the school to possible civil liability for negligent supervision (see Mirand v City of New York, supra). Moreover, since such an order could be construed as effectively suspending defendant for the afternoon, Coyle would arguably have been acting beyond his authority and depriving defendant of his due process rights in violation of Education Law § 3214. On the other hand, Coyle could not abdicate his duties by walking away and allowing defendant to remain in the building, since Coyle was unsure whether defendant was a trespasser and had observed him wearing something which, based on his experience, he believed to be a sign of gang affiliation.
While he could have continued to question defendant, nothing in the record suggests that further questioning would have been productive. To the contrary, the evidence demonstrates that defendant’s identity was not conclusively established even after additional questioning at the Dean’s office. In any event, the officers acted appropriately in asking defendant to go to the Dean’s office, since it was school policy to do so with anyone who could not produce proper identification.
This Court does not have to reach the issue of whether Coyle could have forced defendant to comply with his request, for this Court fully credits Coyle’s testimony that defendant voluntarily consented to go to the Dean’s office. Since “[c]onsent is a valid substitute for probable cause” (see People v Hodge, 44 NY2d 553, 559), there is no need to determine whether the officer had probable cause to detain the defendant.
However, even assuming arguendo that defendant had not consented, this Court would not find that Coyle acted unreasonably in taking defendant to the Dean’s office. Coyle had at least a reasonable suspicion that defendant was either not a student and was trespassing in the building or was cutting classes. In either event, he would have been acting reasonably in detain *55 ing defendant and taking him to the Dean’s office so that his identity could be determined. In detaining a potential trespasser, Coyle would simply be performing one of the central duties of his job (see People v Dorner, supra, at 1089). In detaining a student suspected of cutting classes, Coyle would be enforcing Education Law § 3210 (1) (a) — a function which would be within the scope of his authority and within the traditional role of the police (cf., Matter of Shannon B., 70 NY2d 458 [police acted within their authority in detaining suspected truant for the purposes of transporting her to the Board of Education for further investigation and processing]).
This Court also finds that the "search” of defendant was appropriate. Even assuming this was a full-blown search, such searches of the person of students by school authorities do not require probable cause. Bather, such searches may be made upon “reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school” (New Jersey v T.L.O., supra, at 342, cited with approval in Matter of Gregory M., supra, at 592). Here, Dean Findling had several reasons to suspect that defendant was actually a student at another high school, who had evaded the security scanners at the main entrances to the school and had done so in order to bring a weapon into the school with the intention of perpetrating some gang-affiliated violence. First, defendant was able to answer questions regarding Madison High School, but did not know the name of a single teacher or guidance counselor at Sheepshead Bay High School.[2] Second, defendant claimed that he had no identification card, which was necessary to enter the school at the main entrances. Third, he had been seen in the hall wearing a blue bandana on his wrist — something which, according to Coyle, was an indicium of gang affiliation. Finally, as Coyle was escorting defendant to the Dean’s office, he had been approached by another individual in a threatening manner.
Under these circumstances, this Court concludes that there was at least reasonable suspicion to support a search. However, the Court notes that the gun was actually detected in the *56 course of a frisk of defendant’s outer clothing. This type of limited pat down is less intrusive than a search (see Matter of Gregory M., supra, at 597). Especially in light of the urgent governmental interest in preventing the “introduction of hand guns and other lethal weapons into New York City schools” (id., at 593), this Court would find the school authorities’ actions reasonable even on something less than “reasonable suspicion.”
Finally, this Court concludes that the statements made to Dean Findling need not be suppressed, even though they preceded Miranda warnings. Miranda warnings are required only prior to custodial interrogation. Furthermore, the interrogation must be by a public servant engaged in law enforcement or a person acting in cooperation with, or under the direction of, or as an agent of, a law enforcement officer (People v Jones, 47 NY2d 528). A Dean interrogating a student on school grounds on a matter of school discipline — even a matter that would carry criminal sanctions — is still a private individual, with respect to whose questioning Miranda is inapplicable (People v Irving C., 103 Misc 2d 980, 982; Matter of Brendan H., 82 Misc 2d 1077, 1080).
The statements to Dean Findling are admissible despite the absence of Miranda warnings on two grounds. First, with the exception of the last statement — in which the defendant admitted that the gun was loaded — there was no custodial interrogation. Defendant had come to the Dean’s office voluntarily and was not handcuffed or restrained in any way. A reasonable person in defendant’s position, innocent of any wrongdoing, would have thought he would be allowed to leave the school as soon as he presented a suitable identification or as soon as his true identity was determined.
Second, the questioning was conducted entirely by Dean Findling — a private individual (see People v Irving C., supra, at 982; Matter of Brendan H., supra, at 1080). Although school security officers were present in the cubicle at the time the Dean questioned defendant, there is no evidence suggesting that the Dean was acting as their agent, or in cooperation with, or under the direction of, said officers. Rather, the Dean was acting, not to elicit evidence of criminality on behalf of the police, but to investigate what appeared to be either a violation of school rules or a breach of school security. The officers were present for his protection alone, and did not participate in the questioning in any way.
Even the Dean’s last question, regarding whether the gun was loaded, was not made in cooperation with, or under the *57 direction of, the officers. There is no evidence that anyone asked him to pose the question. Unlike post-arrest police questioning, which “undeniably is aimed at obtaining evidence leading to conviction of the subject,” interrogation by school authorities is “normally investigatory for disciplinary purposes” (Matter of Brendan H., supra, at 1080). There is nothing in the record to suggest that the final question posed by the Dean was for any other purpose than determining facts that would aid personnel at either his high school or at Madison High School to determine the appropriate disciplinary action to take.
On the other hand, the questions posed by the police officer were aimed at obtaining evidence to be used in the criminal investigation. These statements were made after defendant was in custody and before the administration of Miranda warnings. Accordingly, as the prosecution concedes, these statements must be suppressed.
Conclusion
For the reasons set forth above, this Court has granted that portion of defendant’s Huntley motion which sought suppression of defendant’s statements to the officers, but has denied defendant’s motions in all other respects.

. There is some ambiguity in the record as to whether Coyle was a school safety officer or a school safety aide, and there was no discussion concerning the difference, if any, between the two. For purposes of this opinion, this Court has assumed that Coyle was a school safety officer.

. This Court is unpersuaded by defense counsel’s claim that no inference can be drawn from defendant’s total ignorance regarding his new school because he was a recent transfer to the school. Defendant alleged that he was a student who had just finished classes. Even assuming this was the first day of school, one would reasonably expect that he would be able to name one of the teachers whose classes he had attended that day or at least the guidance counselor who had signed him into the school.