791 A.2d 331 (2002)
In the Interest of R.H.
Appeal of R.H.
Supreme Court of Pennsylvania.
Argued December 5, 2000.
Decided February 21, 2002.
*332 Jason Zac Christman, for appellant.
Bernard Ashley Anderson, Stroudsburg, for appellee.
Stuart Lee Knade, Harrisburg, for appellee amicus curiae.
Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN, and SAYLOR, JJ.

OPINION ANNOUNCING THE JUDGMENT OF THE COURT
NIGRO, Justice.
In this appeal, Appellant R.H., a minor, argues that the Superior Court improperly affirmed the order of the trial court denying his motion to suppress the statements he made during questioning by a school police officer. We agree with Appellant that he was entitled to receive Miranda warnings before being questioned by the school police officer and therefore, we reverse the Superior Court's order affirming Appellant's adjudication of delinquency.
The relevant facts and procedural history of this case are as follows. On December 7, 1998, the Monroe County Sheriff notified the East Stroudsburg Area School District Police Department that someone had broken into and vandalized a classroom at East Stroudsburg High School. After entering the classroom, East Stroudsburg School police officers discovered that someone had written graffiti on the blackboards, overturned desks, and discharged the room's fire extinguisher. In addition, small sneaker footprints were observed in fire extinguisher residue on the floor and on the desktops.
The school police officers subsequently obtained a list of students with classes in the vandalized classroom and looked for a person small in stature to match the footprints found in the fire extinguisher residue. After reviewing the student list, the school police suspected that Appellant had been involved with the break-in because he had classes in the room, he was a person of small stature and because his discipline record indicated that he had exhibited unruly behavior in the past. One of the school police officers escorted Appellant to the main building of the school, where Appellant was asked to remove his shoe for comparison with the footprints found in the fire extinguisher residue. After observing the bottom of Appellant's shoe, the officer concluded that the print matched those found in the classroom. The officer then informed Appellant that he was keeping the shoe as evidence and that he was going to question Appellant about the break-in.
The school police officer did not give Appellant Miranda warnings[1] prior to the questioning, nor was Appellant allowed to leave the room until the questioning was completed twenty-five minutes later. During the questioning, Appellant admitted that he was involved in the break-in. The school called the municipal police department and Appellant's mother. The municipal police questioned Appellant and then *333 permitted him to leave with his mother. Subsequently, Appellant was charged with various offenses in juvenile court.
Prior to his juvenile delinquency hearing, Appellant filed a motion to suppress any statements he made during the questioning by the school police officer. Appellant's motion was denied and an adjudication hearing was held, wherein Appellant was adjudicated of burglary, criminal trespass, theft by unlawful taking, criminal mischief, institutional vandalism, and criminal conspiracy. Appellant was then sent to a residential treatment center for nine months, to be followed by one year of probation. The Superior Court affirmed.
On appeal to this Court, Appellant asserts that his Fifth Amendment rights were violated when he was compelled to give evidence against himself. Appellant argues that he should have been given Miranda warnings prior to any questioning by the school police. According to Appellant, school police are constitutionally indistinguishable from municipal police because they are permitted to exercise the same powers as the municipal police while on school property and because they wear uniforms and badges. Consequently, Appellant contends that his confession, given during custodial interrogation by a school police officer, should have been suppressed. We agree.
When reviewing a challenge to the denial of a suppression motion "we must consider only the evidence of the prosecution and so much of the evidence for the defense which remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." Commonwealth v. Hall, 549 Pa. 269, 701 A.2d 190, 197 (1997)(citing Commonwealth v. Cortez, 507 Pa. 529, 491 A.2d 111, 112 (1985)).
To safeguard an uncounseled individual's Fifth Amendment privilege against self-incrimination, suspects subject to custodial interrogation by law enforcement officers must be warned that they have the right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney. See Thompson v. Keohane, 516 U.S. 99, 107, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (citing Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Juveniles, as well as adults, are entitled to be apprised of their constitutional rights pursuant to Miranda. See In re Gault, 387 U.S. 1, 57, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). If a person is not advised of his Miranda rights prior to custodial interrogation by law enforcement officers, evidence resulting from such interrogation cannot be used against him. See Miranda, 384 U.S. at 436, 444, 478-79, 86 S.Ct. 1602; Commonwealth v. Chacko, 500 Pa. 571, 459 A.2d 311, 314-15 (1983). A person is deemed to be in custody for Miranda purposes when "[he] is physically denied of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation." Commonwealth v. Williams, 539 Pa. 61, 650 A.2d 420, 427 (1994) (citations omitted).
In the instant case, it is uncontested that Appellant did not receive Miranda warnings before he was taken into custody for purposes of interrogation. It is also uncontested that Appellant was in custody during the interrogation.[2] Thus, the issue *334 becomes whether school police officers should be considered "law enforcement officers" within the purview of Miranda.
Pennsylvania common pleas courts may appoint school police officers to serve in the school districts within their jurisdiction. See 24 P.S. § 7-778. The court may grant a school police officer the authority to exercise the same powers while on school property as the municipal police, including the power to arrest, issue summary citations, and detain individuals until local law enforcement is notified. Id. § 7-778(a), (c)(2), & (c)(3). By an order dated July 14, 1998, the Court of Common Pleas of Monroe County granted East Stroudsburg school police officers the authority to exercise the same powers as the municipal police within the East Stroudsburg Area School District. The court also granted these school police officers the power to issue summary citations and to detain individuals until local law enforcement is notified.
In affirming the trial court's denial of Appellant's suppression motion in the instant case, the Superior Court concluded that school police officers are more akin to school officials than municipal police officers because school police officers are considered employees of the school district. See 24 P.S. § 7-778(g). The Superior Court noted that Miranda warnings are not required when school officials detain and question a student about conduct that violates school rules. Thus, since Appellant was questioned by a school police officer, i.e, a school official, about an incident involving "a flagrant violation of school rules," the Superior Court found that Appellant was not entitled to Miranda warnings.
While it is true that the East Stroudsburg school police officers involved in the instant matter were employees of the school district, they were also judicially appointed and explicitly authorized to exercise the same powers as municipal police on school property. See 24 P.S. § 7-778(c)(2). Furthermore, as Appellant observes, the school police officers were wearing uniforms and badges during Appellant's interrogation, and the interrogation ultimately led to charges by the municipal police, not punishment by school officials pursuant to school rules. In light of these circumstances, we agree with Appellant that the East Stroudsburg police officers were "law enforcement officers" within the purview of Miranda. Thus, Appellant was entitled to be read his Miranda rights before the school police questioned him and, given their failure to do so, we find that Appellant's Fifth Amendment privilege against self incrimination was violated.[3] Accordingly, the Superior Court's order is reversed and the matter is remanded to the trial court for proceedings consistent with this opinion.[4] Jurisdiction relinquished.
*335 Former Chief Justice FLAHERTY did not participate in the decision of this case.
CAPPY, Justice, files a dissenting opinion.
CASTILLE, Justice, files a dissenting opinion.
NEWMAN, Justice, files a concurring opinion.
SAYLOR, Justice, files a concurring opinion.
EAKIN, Justice, did not participate in the consideration or decision of this matter.
CAPPY, Justice, dissenting.
I must respectfully dissent. I agree with Mr. Justice Castille that the school police officer was not a law enforcement officer for purposes of the Fifth Amendment. I write separately, however, because the Opinion Announcing the Judgment of the Court correctly notes that both parties conceded that the student was in custody at the time of the questioning by the school police officers. Majority slip opinion at 4, n. 2. Therefore, I agree with the lead opinion that any analysis of the custody issue is improper in the instant case. Further, I believe that once it is determined that the school police were not either law enforcement officers or acting at the behest of law enforcement officers, the inquiry ends at that point.
As acknowledged by the lead and dissenting opinions, Miranda[1] warnings are only necessary where the suspect is in custody and the questioning is by law enforcement officers. Miranda, 384 U.S. at 436, 86 S.Ct. 1602; see also Majority slip opinion at 3-4; Dissenting slip opinion at 3. Thus, since a custodial interrogation was conceded in this case, the sole issue before us is whether the school police officers were law enforcement officers for purposes of the Fifth Amendment Miranda requirement.
I agree with Mr. Justice Castille's conclusion that there is no distinction between school police officers and other school staff for Miranda purposes. There is simply no support for the proposition that school administrators must adhere to the precepts of Miranda before questioning students regarding alleged violations of school rules or illegal conduct on school grounds. See In re D.E.M., 727 A.2d 570, 578 (Pa.Super.1999); see also Commonwealth v. Snyder, 413 Mass. 521, 597 N.E.2d 1363, 1369 (1992); State v. Biancamano, 284 N.J.Super. 654, 666 A.2d 199, 203 (1995); People v. Butler, 188 Misc.2d 48, 725 N.Y.S.2d 534, 540-41 (N.Y.Sup.Ct.2001); see, e.g., In re S.K., 436 Pa.Super. 370, 647 A.2d 952 (Pa.Super.1994).
As noted by other jurisdictions, even assuming the fact of a custodial interrogation,
[t]he Miranda rule does not apply to a private citizen or school administrator who is acting neither as an instrument of the police nor as an agent of the police pursuant to a scheme to elicit statements *336 from the defendant by coercion or guile.
Snyder, 597 N.E.2d at 1369; Biancamano, 666 A.2d at 203; see also Commonwealth v. Hamilton, 445 Pa. 292, 285 A.2d 172, 175 (1971)(Miranda warnings were necessary in a situation contrived by police to induce statement by defendant to co-conspirator). Thus, the threshold inquiry in these cases must be directed at whether the school officials were acting as an instrument of the police or an agent of the police at the time the questioning occurred. In the instant case, there is simply nothing to suggest that the school officers were acting at the behest of local law enforcement agents at the time they questioned Appellant. Thus, there was no conduct by a law enforcement officer triggering the protections of Miranda in this case. See, e.g., Snyder, 597 N.E.2d at 1369; Biancamano, 284 N.J.Super. at 663, 666 A.2d at 203. Accordingly, I dissent.
CASTILLE, Justice, dissenting.
Public schools bring very large numbers of students together in close proximity with one another. When children are brought together in such a unique environment, their inexperience and lack of mature judgment often create physical hazards to others or disrupt a critical learning environment for other students. In addition to the challenge of keeping our children safe, our schools are, of course, charged with the life determinant task of educating our young. Indeed, "education is perhaps the most important function of state and local governments." Brown v. Board of Educ., 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). Crime and disciplinary problems can, and often do, frustrate this essential purpose, particularly since students are compelled to attend school and thus have no choice but to associate with the criminally-inclined fewor perhaps merely the immature and unwise fewclosely and daily. Schools must be permitted to employ reasonable measures to ensure a safe and secure environment.
These special and important concerns do not mean that children in school completely forfeit their constitutional rights, but these rights are unquestionably different in the school setting than elsewhere. As the United States Supreme Court recently noted, there is an important caveat to the familiar aphorism that students do not abandon their constitutional rights at the schoolhouse door:
[W]hile children assuredly do not "shed their constitutional rights ....at the schoolhouse gate," .... the nature of those rights is what is appropriate for children in school.

Vernonia Sch. Dist. v. Acton, 515 U.S. 646, 655-56, 115 S.Ct. 2386, 2392, 132 L.Ed.2d 564 (1995) (citation omitted) (emphasis added). In light of the vitally important objective of maintaining a safe and proper educational environment for all students, and the flexibility and leeway which schools and school personnel must be afforded in order to achieve this goal, it is, in my opinion, unquestionably inappropriate to automatically import Miranda[1] into the school environment wholesale and require warnings before school security personnel may question a student. Certainly, neither the Fifth Amendment nor the underpinnings of Miranda require such a result, and the experience of courts in other cases involving schools counsels against such a shortsighted result. I believe the lead opinion has lost sight of the overriding, important interests at issue with its inflexible approach.
*337 Miranda warnings are constitutionally required only in the context of custodial interrogation by law enforcement officers in settings where the concerns that powered the Miranda decision are present. Because I conclude that the appellant here was neither "in custody" nor questioned by "law enforcement officers" in a setting where the concerns that led to Miranda exist, and because the lead opinion ignores the special nature of the school setting and the necessity to maintain good order and to provide for the safety of the students and faculty therein, I respectfully dissent from the Court's importation of Miranda from the station house into the schoolhouse.
Initially, the lead opinion does not examine the threshold question of custody. Instead, the lead opinion states that it is not disputed by the parties that appellant was in custody during the interrogation. For this reason, the lead opinion summarily concludes that this necessary element of Miranda was satisfied here:
A person is deemed to be in custody for Miranda purposes when "[he] is physically denied of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation." Commonwealth v. Williams, 539 Pa. 61, 650 A.2d 420, 427 (1994) (citations omitted).
In the instant case, it is undisputed that [a]ppellant did not receive Miranda warnings before he was taken into custody for purposes of interrogation. It is also uncontested that [a]ppellant was in custody during the interrogation. Thus, the issue becomes whether school police officers should be considered "law enforcement officers" within the purview of Miranda.

Op. at 4 (footnote omitted).[2] Although the Commonwealth does not actively dispute the question of custody, this Court is not bound by any such concession of the parties. Given the importance of this case in establishing the place, if any, of Miranda in the schools, I believe this Court should offer some guidance on this indispensable prong of Miranda, notwithstanding any concession by the parties. Moreover, I write on the question of custody because, in my view, the singular focus upon restricted "freedom of action or movement," suggested by the lead opinion and the concurrence misconstrues the test for custody under Miranda.
Preliminarily, I would note that I am unconvinced that appellant was in fact not free to leave during the questioning by school personnel. Appellant was not formally arrested. He was not handcuffed or physically restrained in any way. The door to the room where the questioning took place remained open throughout the interview. It is not apparent that there was anything preventing appellant from refusing to answer the questions posed to him by school personnel and walking out of the office. Nor do I see any reason to assume that the school setting alone automatically restricts the freedom of all students to leave for Miranda purposes. In fact, the record here is silent as to what would have happened if appellant had refused to cooperate or attempted to leave the school building.
In any event, even if I were to accept the assumption that appellant's mere status as a student being interviewed by *338 school security officials rendered him not free to leave, this is not dispositive of the Miranda custody question. An individual is not in custody for Miranda purposes simply because his freedom of action has been restricted in a significant way or he reasonably believes that his freedom of action or movement has been restricted by the questioning. The U.S. Supreme Courtwhich is the ultimate authority on the interpretation of Miranda questions has held that, in determining whether an individual was in custody, "the ultimate inquiry is ... whether there [was] a `formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." See Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528-29, 128 L.Ed.2d 293 (1994) (citations omitted). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Id. at 323, 114 S.Ct. at 1529. Thus, not every mere deprivation of an individual's freedom of action triggers Miranda `s constitutional protections, and the subjective sentiments of the person being interrogated are wholly irrelevant to the objective custody inquiry.
In Berkemer v. McCarty, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984), for example, the Supreme Court held that Miranda warnings were not required prior to the roadside questioning of a motorist detained in a traffic stop. Although the Supreme Court recognized that "a traffic stop significantly curtails the `freedom of action' of the driver," and that, under the law of most states, it is in fact a crime to drive away without permission, it emphasized that this was not the end of the Miranda custody inquiry. "Fidelity to the doctrine announced in Miranda requires that it be enforced ... only in those types of situations in which the concerns that powered the decision are implicated." Id. at 437, 86 S.Ct. 1602 104 S.Ct. at 3148-49. The Supreme Court found that the fact that traffic stops are typically temporary and brief, are conducted in public, and usually involve only one or at most two policemen "mitigate[d] the danger that a person questioned will be induced `to speak where he would not otherwise do so freely.'" Id. at 437, 104 S.Ct. at 3149 (quoting Miranda, 384 U.S. at 467, 86 S.Ct. at 1624).
Similarly to Berkemer, the detention of appellant in a room in the school that he regularly attended does not automatically implicate the concerns that underlie the Miranda decision. As noted above, appellant was neither formally arrested nor placed in handcuffs. The questioning took place in an office in his familiar high school surroundingsnot in the foreign, perhaps intimidating confines of a police station. The office had a window, and the door was left open. He was questioned by two members of the school staff with whom he was likely acquainted since he had had prior disciplinary problems at the school. Appellant makes no claim that the school security officers elicited his confession by using physical force, coercive interrogation tactics, or trickerystationhouse tactics that helped to power the Miranda decision. Compare Miranda, 384 U.S. at 445-55, 86 S.Ct. at 1612-17. The entire encounter at the school took, at most, twenty-five minutes.
Thus, appellant was not "swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to [coercive] techniques of persuasion...." Id. at 461, 86 S.Ct. at 1621; see also Minnesota v. Murphy, 465 U.S. 420, 433, 104 S.Ct. 1136, 1145, 79 L.Ed.2d 409 (1984) ("Many of the psychological ploys discussed in Miranda capitalize on the suspect's unfamiliarity with the officers *339 and the environment"). To the contrary, appellant was briefly questioned in a relatively familiar environment by two school staff members. There is simply no evidence to suggest that the interview involved any of the raiments of arrest or approached the potentiality for compulsion with which the Supreme Court was concerned in Miranda. See also Doe v. Bagan, 41 F.3d 571, 575 n. 3 (10th Cir.1994) (regardless of whether child believed he could leave school principal's office while he was being interviewed by caseworker about suspected sexual abuse allegedly committed by him, child was not in custody for Miranda purposes where it was not shown that interview involved any characteristics of arrest or potentiality for compulsion). At a minimum, there must be some restriction on liberty beyond that inherent in the school setting, and of a nature likely to affect substantially the student's will to resist and compel him to speak where he otherwise would not do so, to trigger a finding of custody for Miranda purposes.
Under the unsupported extension of the Miranda custody requirement proposed in the lead and concurring opinions, a school police officer would virtually always be required to issue Miranda warnings before interviewing a student on school grounds, regardless of the specific circumstances of the encounter. For example, a school police officer would presumably be required to issue Miranda warnings to a student sitting at a cafeteria table with his friends before asking the student questions that might lead to school discipline. Such a student would be no less "in custody" than the appellant sub judice and the officer's question seeks information that could possibly incriminate the student. Likewise, Miranda warnings would presumably have to precede a conversation in a school hallway between a school police officer and a student regarding whether the student had been involved in a fight during recess earlier in the day. Miranda, which involved the inherently coercive atmosphere of the police station, was plainly not intended to apply to the numerous brief, non-coercive encounters that school security personnel have with students at school on a daily basis. Because appellant was not in custody for purposes of Miranda, I would affirm the Superior Court on this ground alone.[3]
Even if I could accept the Court's predicate assumption that appellant was in custody, I still believe that Miranda warnings were not required here. My conclusion in this regard derives from other relevant precedents which have recognized the unique considerations that attend the public school setting, as well as the constitutional underpinnings of the Miranda decision.
In the seminal case of New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the U.S. Supreme Court held that students have a legitimate expectation of privacy regarding their personal effects while in school that is protected by the Fourth Amendment. The Court noted, however, that "[a]gainst the child's interest in privacy must be set the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds." Id. at 339, 105 S.Ct. at 741. The Court recognized that "maintaining security and order in the schools requires a certain degree of *340 flexibility in school disciplinary procedures...." Id. at 340, 105 S.Ct. at 742. Accordingly, the Court crafted a relaxed standard for determining the legality of a search of a student under the Fourth Amendment:
We join the majority of courts that have examined this issue in concluding that the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search.
Id. at 341, 105 S.Ct. at 742. The Court explained that, "[b]y focusing attention on the question of reasonableness, the standard will spare teachers and school administrators the necessity of schooling themselves in the niceties of probable cause and permit them to regulate their conduct according to the dictates of reason and common sense." Id. at 343, 105 S.Ct. at 743. The lead opinion's approach ignores the distinct nature of the school setting in its blanket application of Miranda to the schoolhouse.
Even if it is assumed that the Fifth Amendment should have some applicability in the school context, there is much to say in favor of adopting a T.L.O.-like rule of "reason and common sense," rather than requiring a per se application of Miranda. Our Superior Court has held that school personnel should be afforded such latitude in the Fifth Amendment context. For example, in In re S.K., 436 Pa.Super. 370, 647 A.2d 952 (1994), a security officer for the Pittsburgh Board of Education asked a student whether he had been smoking. The child's affirmative response led to a search of his person, which revealed packets of crack cocaine. The Superior Court held that Miranda did not apply in this setting. More recently, in In re D.E.M., 727 A.2d 570 (Pa.Super.1999), relied on by the Superior Court in the instant matter, a school principal asked a student whether he possessed a gun in school. The student admitted that he had a gun in school and was ultimately charged criminally with various firearms offenses. The Superior Court concluded that "school officials do not need to provide a student with Miranda warnings before questioning the student about conduct that violates the law or school rules." Id. at 578.
Many of our sister jurisdictions have likewise determined that, because of the unique concerns in the school environment, school personnel are not automatically required to advise students of their constitutional rights prior to questioning them regarding criminal or disciplinary matters. See, e.g., In re Harold S., 731 A.2d 265 (R.I.1999); State v. Tinkham, 143 N.H. 73, 719 A.2d 580 (1998); Commonwealth v. Snyder, 413 Mass. 521, 597 N.E.2d 1363 (1992); State v. Biancamano, 284 N.J.Super. 654, 666 A.2d 199 (1995). The Biancamano court explained its conclusion as follows:
We have no doubt, however, that the T.L.O. standards concerning Fourth Amendment searches are equally applicable to defendant's Fifth Amendment claim. A school official must have leeway to question students regarding activities that constitute either a violation of the law or a violation of school rules. This latitude is necessary to maintain discipline, to determine whether a student should be excluded from the school, and to decide whether further protection *341 is needed for the student being questioned or for others.
666 A.2d at 202.
It is true, as the lead opinion notes, see op. at 5 n. 3, that T.L.O., as well as this Court's decisions in Commonwealth v. Cass, 551 Pa. 25, 709 A.2d 350 (1998) (Opinion Announcing Judgment of Court by Cappy, J.) and In the Interest of F.B., 555 Pa. 661, 726 A.2d 361 (1999), which applied T.L.O.'s relaxed constitutional standard to school searches, are Fourth Amendment cases and thus do not necessarily "preclude[ ]" the Court from finding a Fifth Amendment violation. But that distinction, if anything, counsels for a greater need for a reasonable, commonsense rule in the Fifth Amendment context. Unlike issues involving school searches or seizures, questions involving Miranda already involve a significant degree of attenuation from the basic right being protected, i.e., the Fifth Amendment trial privilege against compulsory self-incrimination. This is so because Miranda involved an extension of that trial-based privilege into the police station. The reason for the station house extension, as noted above, had to do with the unique and inherently coercive nature of police station interrogations. Interviews of students by school employees in the familiar settings of their schools are not remotely so inherently coercive. Reason and common sense, rather than a further extension of the comparatively inflexible Miranda doctrine, should govern this Court's approach to the question of the role of the Fifth Amendment in the school setting.
It is notable that the lead opinion does not dispute the wisdom of those cases holding Miranda inapplicable when the schoolhouse interview is conducted by a school official. The lead opinion reasons, however, that the East Stroudsburg High School police officers in this case were not "school officials" but were "law enforcement officers" automatically subject to the full effect of Miranda, regardless of the school setting, because: (1) they were judicially appointed and authorized to exercise the same powers as municipal police on school property; (2) they were wearing uniforms and badges during appellant's questioning; and (3) the questioning ultimately led to charges by the municipal police, not simply punishment by school officials pursuant to school rules. See op. at 5.[4] None of these factors or established case law, however, remotely supports a distinction between school police officers and other school district employees for Miranda purposes. Moreover, the rule resulting from this distinction is not consonant with either the concerns that animated Miranda or the policy goals of protecting and maintaining a proper and safe educational environment for all students policies which have motivated jurisprudence in this area and which should be no less applicable in the Fifth Amendment context than in the Fourth Amendment context.
Although school police may be authorized to exercise the same powers as municipal police on school property pursuant to 24 P.S. § 7-778(c)(2), these powers must be viewed in the context of the statute as a whole and in light of the function of schools. The duties of the school police are not solely, or even predominantly, to investigate criminal conduct, but rather the prescribed duty is to "enforce good order in school buildings, on school buses *342 and on school grounds." § 7-778(c)(1). Thus, school police are authorized to detain individuals, but only "until local law enforcement is notified." § 7-778(c)(3). Most importantly, the salaries of school police are paid by the school district, § 7-778(e), and they are, "at all times," employees of the school district, § 7-778(g). Thus, it is the school district, not the police department, that school police answer to. When § 7-778 is read in toto, it is apparent that school police officers appointed under the statute are not so much law enforcement officials charged with ferreting out criminal activityas the lead opinion necessarily assumes in granting relief herebut are specialized members of the school staff, employed and compensated by the school district, whose purpose is to assist teachers and school administrators in the important, unique requirement of maintaining safety, order, and discipline.
Furthermore, the mere fact that the school officers were wearing school district uniforms and badges does not ipso facto convert them into traditional police officers subject to full application of the Miranda doctrine. In fact, pursuant to § 7-778(d), the officers who questioned appellant were required to wear, in plain view, badges which bore the words "School Police" and the name of the school district for which they had been appointedfactors that obviously distinguished them from local or state law enforcement personnel. Moreover, badges and uniforms do not determine the applicability of Miranda even when traditional police officers are involved; rather, it is the fact of custodial interrogation. Thus, even a badgeless, non-uniformed police officer may need to comply with Miranda.
The lead opinion's post hoc argument that Miranda warnings were required here because the questioning ultimately led to criminal charges is also unpersuasive. The decision to bring criminal charges depends on the nature of the offense, the ultimate prosecuting authority's view of the evidence against the individual, and a host of other factors outside of the control, or even the bailiwick, of school policeor the school for that matter. The identity of the interrogators plays little or no role in that decision. A focus on whether a student is eventually charged with criminal wrongdoing is thus both over-inclusive and under-inclusive. Law enforcement officials routinely engage in questioning that does not lead to criminal charges, and non-law enforcement personnel, on occasion, engage in questioning that does lead to charges by the police. Moreover, a rule focusing on whether charges are eventually brought offers no guidance in the real world, since that decision cannot be known at the time of the questioning. We should not fashion an application of Miranda that schools can never comply with, nor one that requires a per se application in every instance in order to comply.
The lead opinion fails to cite a single decision in support of its broad conclusion. In fact, the cases in Pennsylvania to date have not drawn a distinction between school police officers and other school staff for suppression purposes. See In re S.K., supra (questioning of student by security officer for Pittsburgh Board of Education did not have to be preceded by Miranda warnings); In the Interest of S.F., 414 Pa.Super. 529, 607 A.2d 793, 794-96 (1992) (search by plainclothes school police officer for School District of Philadelphia permissible under reasonableness standard enunciated in T.L.O.). Most recently, the case of Brian A. v. Stroudsburg Area Sch. Dist., 141 F.Supp.2d 502 (M.D.Pa.2001), involved a claim that an assistant principal and a lieutenant in the school police at Stroudsburg High School contravened the Fifth Amendment when they questioned a *343 student regarding an alleged bomb threat without first apprising him of his Miranda rights. The court did not distinguish between the assistant principal and the school police officer in holding that " `[u]nder the federal constitution, students facing disciplinary action in public schools are not entitled to Miranda warnings.'" Id. at 511, 86 S.Ct. 1602 (quoting Jarmon v. Batory, 1994 WL 313063, at *11 (E.D.Pa. 1994)).
A great number of our sister jurisdictions have also declined to find that enhanced constitutional protections attach merely because a school security officer, rather than a school administrator, is involved. See, e.g., People v. Dilworth, 169 Ill.2d 195, 214 Ill.Dec. 456, 661 N.E.2d 310, 317 (1996), cert denied, 517 U.S. 1197, 116 S.Ct. 1692, 134 L.Ed.2d 793 (1996) (noting that most courts have held that T.L.O. reasonable suspicion test, which obtains where school officials initiate search, applies also in cases involving school police or liaison officers acting on their own authority) (collecting cases); In the Interest of P.E.A., 754 P.2d 382, 384 n. 2 (Colo.1988) (principal and school security officer not "law enforcement officials" for purposes of statute requiring that child have parent or guardian present and be advised of Miranda rights prior to police questioning); Wilcher v. State, 876 S.W.2d 466, 467 (1994) (applying reasonable suspicion standard where searcher was "police officer for the Houston Independent School District"); State v. Wolfer, 39 Wash.App. 287, 693 P.2d 154, 155 (1984) (Miranda does not apply to individual "employed by the security department of the Federal Way School District").
That our precedents have generally not distinguished between school police or security officers and other school employees is not surprising in light of the unique policy concerns that are present in the school context. As Mr. Justice Cappy noted in Cass, T.L.O. and its progeny relaxed the constitutional standards applicable to public schools, not because of any special relationship between students and teachers or administrators vis-a-vis other school personnel such as school police officers, but because of the "unique setting of the school environment." Cass, 709 A.2d at 356; see also T.L.O., 469 U.S. at 340, 105 S.Ct. at 742 ("It is evident that the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject") (emphasis added). At issue in Cass was the constitutionality of a search in which school officials, assisted not by school police, but, significantly, by two members of the Erie Police Department, conducted a generalized canine drug sniff of all of the student lockers in the school and then opened and searched those lockers, and the lockers adjacent thereto, where the dog had indicated possible contraband. The plurality found the search permissible under the Fourth Amendment and Article I, Section 8 of the Pennsylvania Constitution, noting that a student's constitutional rights are necessarily limited by the special nature of the school environment:
The limits of [a student's] expectation of privacy must be ascertained by considering the reasonable needs of the school to, first and foremost, protect the safety and welfare of all the students, to ensure school discipline and compliance with school regulations, and to maintain school property, which includes the school's lockers. The need to protect all the students, to ensure school discipline, and protect school property, limits the student's expectation of privacy while in the school environment.
*344 Cass, 709 A.2d at 360.[5]
Likewise, in In the Interest of F.B., the appellant challenged the constitutionality of a generalized point of entry search, conducted by Philadelphia Police Officers but under the direction of the School District of Philadelphia, at Philadelphia's University City High School. All students entering the school were required to stand in line before a table and empty their pockets while their backpacks, coats, etc., were searched. Each student was also scanned by a hand-held metal detector before being permitted to enter the school. Mr. Justice Cappy's plurality opinion affirmed the constitutionality of the search in light of again, inter alia, the "sui generis school environment." Id. at 368. Thus, it is the special nature of the school setting, and the necessity for the personnel therein to maintain good order and provide for the safety of all the students therein, and not the specific identify of the party conducting the search or the interrogation, which has powered this Court's precedents in this area. Indeed, if it were the identity of the interrogators that mattered, it would be difficult to explain the results in Cass and F.B., where the actual searches were conducted, not by school police, but by local police at the behest of school administrators. The lead opinion's per se rule again ignores the special and important policy concerns that underlie our jurisprudence in the school context.[6]
The concurring opinion by Madame Justice Newman proposes a test that purports to be more flexible than the lead opinion's wholesale application of Miranda. Justice Newman suggests that Miranda warnings should precede custodial questioning by "school officials, school police officers, or any other person" whenever "the constitutional interests of the student outweigh the interest of the school in solving the crime[,]" and that one of the student's parents or legal guardian should be present during any such questioning. Concurring op. at 4-6. In weighing the constitutional interests of the student under this approach, Justice Newman writes, the following factors should be considered: (1) *345 the age of the student to be questioned; (2) the ability of the juvenile to understand the Miranda warnings, if they are given; (3) the gravity of the offense alleged; (4) the prospect of criminal proceedings, as opposed to merely school-related discipline; and (5) the extent of the coercive environment in which the questioning occurs. See Concurring op. at 5.
I cannot agree with this test, which, in many respects, is broader than the lead opinion's approach. Certainly, with respect to the number and types of people who would be required to adhere to the rigid Miranda precepts, the concurrence's rule is far broader than the lead opinion's. This approach would make Miranda applicable not just to the school police but to all school personnel, including teachers, administrators, custodial staff, cafeteria workers, etc., as well "any other person" who may question a student. As stated, the rule presumably would apply even to another student. As Justice Cappy notes, there is simply no support in the case law for the proposition that teachers or school administrators must comply with Miranda before questioning a student regarding alleged violations of school rules or illegal conduct on school grounds. In fact, as I have described, the great weight of authority, in this Commonwealth and elsewhere, is to the contrary.
Moreover, it is, in my view, neither "reasonable" nor "commonsensical" to construe the Fifth Amendment as requiring a teacher, school administrator or other school official to follow the concurrence's test. As Justice Saylor has noted in another context:
[T]he United States Supreme Court has emphasized [that] rules fashioned by courts to implement constitutional precepts that regulate police activities should be expressed in terms that are readily understandable and applicable in daily encounters.
Commonwealth v. Strickler, 563 Pa. 47, 757 A.2d 884, 899 (2000) (citing New York v. Belton, 453 U.S. 454, 458, 101 S.Ct. 2860, 2863, 69 L.Ed.2d 768 (1981)). To comply with the concurrence's test, a school employee (or "any other person" for that matter), before questioning a student about possible wrongdoing, would be required to consider the age and mental acuity of the student, assess the gravity of the offense at issue against an unknown scale, somehow predict whether the student will face criminal proceedings in the future, evaluate the extent of the coercive environment and then, if on balance it appears that the constitutional interests of the student outweigh the disciplinary interests of the school, recite the Miranda warnings. How, one would query, are school officials to master this test? How is a school employee, with no legal training, to know with any degree of certainty, for example, whether a student may eventually face criminal charges? The only safe course for school officials under this test would be to always issue Miranda warnings. The concurrence's approach would thus severely circumscribe the flexibility and latitude school officials need so that they can ensure a safe and secure learning environment for all students. Just as the unique educational mission of our schools requires that school officials, in the Fourth Amendment context, be spared "the necessity of schooling themselves in the niceties of probable cause" and be permitted to "regulate their conduct according to the dictates of reason and common sense[,]" T.L.O., 469 U.S. at 343, 105 S.Ct. at 743, it is equally imperative that educators be spared the necessity of schooling themselves in the arcana of Miranda law and applying a complicated, multi-part balancing test each time they wish to speak with a student.
*346 I also note my disagreement with the concurrence's proposed resurrection of the moribund "interested adult" rule. See Concurring op. at 6. This Court abrogated the per se interested adult rule, which had provided that no person under the age of eighteen years could validly waive his or her Miranda rights without first being provided an opportunity to consult with an adult primarily interested in the juvenile's welfare, in Commonwealth v. Christmas, 502 Pa. 218, 465 A.2d 989 (1983). The following year, the Court further rejected the application of a rebuttable presumption that a juvenile is incompetent to waive his constitutional rights without first having an opportunity to consult with an interested and informed adult. See Commonwealth v. Williams, 504 Pa. 511, 475 A.2d 1283, 1287 (1984). The reasons which led this Court to abandon the interested adult rule almost twenty years agothat it is overly paternalistic, unnecessarily protective, and sacrifices too much of the interests of justiceare just as compelling today as they were then, and I see no reason to revive this discarded doctrine, particularly in the context of schoolhouse questioning, which does not involve the inherently coercive atmosphere of the police station.
For all of the above reasons, I respectfully dissent.
NEWMAN, Justice, concurring.
While I agree with the ultimate conclusion of Justice Nigro that R.H. was entitled to Miranda warnings in this case, I respectfully disagree with his creation of a per se rule requiring Miranda warnings whenever a student is questioned by police on school grounds. I write separately to acknowledge that special considerations exist in the school environment, which, depending upon the circumstances of the situation, could render Miranda warnings unwarranted.
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court of the United States held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444, 86 S.Ct. 1602. "An interviewee [is in custody] whenever the person is physically deprived of freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by [the] interrogation." Commonwealth v. Rucci, 543 Pa. 261, 670 A.2d 1129, 1139 (1996). "Interrogation occurs when the police should know that their words or actions are reasonably likely to elicit an incriminating response and the circumstances must reflect a measure of compulsion above and beyond that inherent in custody itself." Commonwealth v. Fisher, 564 Pa. 505, 769 A.2d 1116, 1125 (2001) (internal citations omitted).[1]
However, the Supreme Court of the United States has recognized that the school setting requires modification of constitutional protections. In New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), a high school teacher found a fourteen-year-old student smoking in the bathroom, in violation of a school policy prohibiting smoking on school grounds. The teacher escorted the student to the office of the Vice-Principal; the Vice-Principal questioned the student, *347 who denied that she had been smoking. The Vice-Principal demanded to see the student's purse, opened the purse, found a pack of cigarettes, and noticed rolling papers. Aware that rolling papers are often used to smoke marijuana, the Vice-Principal searched deeper into the purse, finding marijuana, a pipe, empty baggies, a large quantity of money, an index card listing the names of students who allegedly owed T.L.O. money, and two letters implicating her in the sale of drugs.
The State of New Jersey commenced delinquency proceedings against T.L.O. T.L.O. moved to suppress the evidence obtained from her purse as an invalid search and seizure. The New Jersey Superior Court denied the motion, which the Appellate Division affirmed. The New Jersey Supreme Court reversed, holding that the evidence should have been suppressed because the search was unreasonable. The U.S. Supreme Court reversed, holding that, while juvenile students have privacy rights in items brought to school, the standard for determining the propriety of the search is reasonableness, and the search was reasonable in this situation. The Court reasoned that "the child's interest in privacy must be set [against] the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds." T.L.O., 469 U.S. at 339, 105 S.Ct. 733. "By focusing attention on the question of reasonableness, the standard will spare teachers and school administrators the necessity of schooling themselves in the niceties of probable cause and permit them to regulate their conduct according to the dictates of reason and common sense." Id. at 343, 105 S.Ct. 733.[2]
The concerns articulated by the U.S. Supreme Court in T.L.O. are likewise implicated in the context of the Fifth Amendment privilege against self-incrimination. A student does not lose his rights when he enters the school, but the school officials must have the ability to protect adequately the other students. As Justice Castille recognizes, the U.S. Supreme Court has said that, "while children assuredly do not shed their constitutional rights at the schoolhouse gate, the nature of those rights is what is appropriate for children in school." Vernonia School District 47J v. Acton, 515 U.S. 646, 655-656, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (internal quotation and citations omitted). Accordingly, I cannot conclude that students in school never have the right to Miranda warnings; rather, T.L.O. and Vernonia School District require this Court to develop a standard by which the rights of the student can be protected without compromising the ability of school officials to investigate the alleged criminal conduct and protect the entire student population.
Justice Castille argues that this Court's decisions in Commonwealth v. Cass, 551 Pa. 25, 709 A.2d 350 (1998) (Opinion Announcing the Judgment of the Court, per Cappy, J.), and In the Interest of F.B., 555 Pa. 661, 726 A.2d 361 (1999), support his conclusion that the school officers in the present case were not required to give Miranda warnings to R.H. I disagree and instead concur with Justice Nigro that Cass and F.B. do not mandate such a result. Cass and F.B. stand for the proposition that the school environment requires modification of otherwise applicable Fourth Amendment search and seizure jurisprudence, not the abandonment of same. "As this court recognized in Cass, general searches within the school environment do not offend the Fourth Amendment where *348 the search meets the reasonableness test...." F.B., 726 A.2d at 364.[3]
I would extend T.L.O., Cass, and F.B. to the Fifth Amendment context and hold that the school officials should give the student Miranda warnings when the constitutional interests of the student outweigh the interest of the school in solving the crime. When weighing the constitutional interests of the student in this setting, courts should consider the following factors: (1) the age of the student to be questioned (the older the student is, the more likely the information elicited from him in an interrogation will be used against him in a court of law, rendering Miranda warnings more necessary); (2) the ability of the juvenile to understand the Miranda warnings, if they are given; (3) the gravity of the offense alleged (likewise, the more serious the offense the school officials are investigating, the more likely that he will be criminally charged); (4) the prospect of criminal proceedings, as opposed to merely school-related discipline; and (5) the extent of the coercive environment in which the questioning occurs.
For Miranda rights to attach at all, the student being questioned must be in custody and must be subject to an interrogation. The fifth factor presumes the existence of custody, and instead looks at the nature of the custody, specifically, the number of questioners present, the place of the questioning, and the tactics used to elicit the information sought. For example, if three or four persons are interrogating the student in the principal's office and are threatening to file criminal charges if the student does not cooperate, this is a highly coercive environment. The more coercive the environment, the greater the need to ensure that the student's constitutional rights are not violated. When a student is in custody and being interrogated, the right to be given Miranda warnings presumptively attaches. However, recognizing that the school setting is sui generis,[4] the school officials can demonstrate that the warnings are not necessary if, after balancing the factors articulated above, it was reasonable for them not to Mirandize the student.
In cases where the student will likely be subjected to criminal or delinquency proceedings outside of the school, I would hold that school officials, school police officers, or any other person wishing to question that student for the purpose of eliciting information about the alleged crime to be used in such a proceeding, should first inform the student's parent or guardian of his or her wish to question the student and allow the parent or guardian to be present during the interrogation.[5] Prior to the "interview," the interviewer should either *349 administer Miranda warnings or contact the municipal police, who can advise the student of his rights. A student suspected of taking chalkboard erasers from a classroom need not be read his Miranda rights, even if he "blurts out" during the interview, unsolicited, that he committed a more serious crime; at the time of the interrogation, the prospect of discipline outside of the school context was minimal. If, however, during the questioning, it becomes clear to the questioner that the student may have committed serious crimes that would subject him to out-of-school disciplinary or criminal proceedings, at that point the interview should cease, the parent or guardian of the student should be contacted, and questioning should not resume until the parent or guardian is present and the student has been read his Miranda rights.
In the case sub judice, I agree with Justice Nigro that R.H. was in custody and was subject to an interrogation.[6] R.H. was born on July 23, 1982, and was, therefore, approximately sixteen and one-half-years old when the East Stroudsburg High School Police (School Police) questioned him on December 7, 1998. The School Police were investigating vandalism of a classroom, which included graffiti on the chalkboards, a smashed VCR, overturned desks, and a discharged fire extinguisher. The School Police determined that the vandal had forcibly broken into the room. Given his age and the magnitude of the damage to the classroom, at the time the School Police interrogated R.H., it was more likely than not that they were going to pursue legal action rather than limit themselves to in-school discipline. Moreover, the environment in which he was interviewed was coercive. A School Police officer escorted R.H. to the office of the School Police, where three uniformed officers questioned him for approximately twenty-five minutes.
In light of the aforementioned facts, the failure of the School Police to provide Miranda warnings to R.H. violated his Fifth Amendment privilege against self-incrimination. Therefore, I agree with Justice Nigro that R.H. was entitled to be read his rights before the School Police interrogated him and, because the School Police failed to do this, his Fifth Amendment privilege against self-incrimination was violated.
SAYLOR, Justice, concurring.
Like Madame Justice Newman, I disagree with the opinion announcing the judgment of the court to the extent that it can be read as imposing a per se rule applicable to the school setting. I would also emphasize the substantial interest of school administrators and educators in ensuring discipline and the need to afford them latitude in questioning students respecting activities that may violate school rules. See Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 655, 115 S.Ct. 2386, 2392, 132 L.Ed.2d 564 (1995)(observing that the power exercised by public schools is "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults"). See generally In re Harold S., 731 A.2d 265, 267-68 (R.I.1999)(concluding that, where school officials are not acting as agents of the police, Miranda warnings are not required, even if a juvenile or criminal prosecution results from statements given during the course of the interview); State v. Biancamano, 284 N.J.Super. 654, 666 A.2d 199, 202 (1995). Nevertheless, I believe *350 that there is a significant change in dynamics in encounters involving school officials dedicated to security and investigative purposes and, in particular, uniformed school police officers, particularly where they are possessed with the power and authority of law enforcement officials, including the power of arrest. Cf. Interest of J.C., 591 So.2d 315, 317 (Fla.App.1991).[1] By analogy, where a police officer participates in the questioning of a student, other jurisdictions have also analyzed the custody issue through a standard adapted for juveniles, namely, a reasonable person in the child's position. See generally In re L.M., 993 S.W.2d 276, 288 (Tex.App.1999) (collecting cases). Ultimately, I also believe that a totality assessment represents an essential, guiding criterion in cases involving interrogations by uniformed school police officers, and I join in the totality assessment provided by Justice Newman in the penultimate paragraph of her concurring opinion. Cf. John Doe, 130 Idaho 811, 948 P.2d 166, 173-74 (1997).
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (holding that a defendant who is subject to custodial interrogation must be advised, in clear and unequivocal language, of his constitutional right to remain silent and his right to a lawyer).
[2] Although Justice Castille's dissent goes through a lengthy analysis regarding its belief that Appellant was not "in custody" for purposes of Miranda, we note that the Commonwealth itself does not raise that argument and in fact, concedes in its brief that Appellant was in custody for purposes of Miranda. See Cmwlth. Br. at 6 (students are "always in custody during school hours").
[3] Justice Castille's dissent indicates that both this Court's plurality decision in Commonwealth v. Cass, 551 Pa. 25, 709 A.2d 350 (1998), and our decision in In the Interest of F.B., 555 Pa. 661, 726 A.2d 361 (1999), support a conclusion that students are not entitled to Miranda warnings before being questioned by school police officers. Those cases, however, dealt with a completely different situation than the one before the Court today and did not in any way seek to address the issue at bar, i.e. whether the East Stroudsburg school police were required to give Appellant Miranda warnings before questioning him. Nothing in Cass or F.B., contrary to what the dissent infers, precludes this Court from holding that Appellant's Fifth Amendment rights were violated in the instant case.
[4] In addition to his Fifth Amendment claim, Appellant also claims that Article I, Section 9 of the Pennsylvania Constitution requires that the school police officers give Miranda warnings. Appellant does not present a separate argument based on Article I, Section 9, but merely asserts that Miranda warnings by school police officers are required under both the federal and state constitutions. However, since we find that Appellant is entitled to relief under the Fifth Amendment, there is no need to reach his Article I, Section 9 claim. See Gondelman v. Commonwealth, 520 Pa. 451, 554 A.2d 896, 898 (1989)(if appellant prevails on federal constitutional claim, this Court does not need to address the arguments predicated upon the Pennsylvania Constitution).
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The concurring opinion by Madame Justice Newman agrees with the lead opinion that appellant was subjected to custodial interrogation, concluding that "[a]ny reasonable high school student in the situation would have felt as though the questioning significantly restricted his or her freedom of movement or action." Concurring op. at 6 n. 6.
[3] This Court may affirm the order of the court below if the result reached by the lower court is correct without regard to the grounds relied upon by that court. See Moorhead v. Crozer Chester Med. Ctr., 564 Pa. 156, 765 A.2d 786, 787 n. 2 (2001) (citing Pennsylvania Game Comm'n v. State Civil Service Comm'n (Toth), 561 Pa. 19, 747 A.2d 887, 888 n. 1 (2000)).
[4] In his concurring opinion, Mr. Justice Saylor similarly concludes that the school police officers here are distinguishable from other school staff members as a matter of Fifth Amendment law because these officials were vested with the full authority of municipal police officers, including the power of arrest. See Concurring op. at 2 n. 1.
[5] Mr. Justice Cappy's plurality opinion in Cass was joined by Madame Justice Newman and this Justice. Former Chief Justice Flaherty authored a concurring opinion, joined by Mr. Justice Nigro, in which he agreed with the plurality's treatment of federal law, but disagreed with its treatment of Pennsylvania law. The concurring opinion nonetheless concurred in the result reached by the plurality, in part, because it agreed that the "school environment is sui generis." Cass, 709 A.2d at 366 (Flaherty, C.J., concurring). The lead opinion ignores the sui generis school environment recognized by five of the six Justices who participated in Cass.
[6] In requiring a rigid application of Miranda in the fluid public school context, the lead opinion also fails to account for the multitude of practical problems which its ruling likely will create. For example, it is inevitable that many students, because of their youth, lack of maturity, or lack of experience will simply not understand the Miranda warnings when given. What is a fourth-grader, for instance, to make of the Miranda litany? Also, what happens if a student actually invokes his or her right to remain silent? Can the child be punished by school authorities for doing so, e.g., segregated from the general school population, suspended or expelled, or must he or she be allowed to return to the normal scholastic routine? If the student invokes his or her right to counsel, how will this right be honored? Presumably, the child will be unable to retain an attorney on his or her own. Must the student's parents be notified so that they can retain an attorney on the child's behalf? Or will the school maintain a list of "school attorneys" to notify in such an event to be provided most likely at taxpayer expense? What should/must be done with the child in the interim? These questions and many other practical concerns will necessarily arise following any application of Miranda to the schoolhouse, but are left unanswered by the Court's unprecedented new formulation.
[1] See generally, In re Gault, 387 U.S. 1, 55, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (holding that "the constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults").
[2] For a more in-depth discussion of New Jersey v. T.L.O. and the cases interpreting that decision, refer to Justice Castille's opinion in the present case.
[3] In F.B., we articulated this "reasonableness test" as follows:

The three factors to be weighed and balanced in reviewing the constitutionality of a general search under the Fourth Amendment are: 1) the nature of the privacy interest upon which the search at issue intrudes, 2) the character of the intrusion, and 3) the nature and immediacy of the governmental concern and the efficacy of the means utilized to address that concern.
Id. at 364.
[4] See In the Interest of F.B., 555 Pa. 661, 726 A.2d 361, 368 (1999).
[5] I recognize that this Court in Commonwealth v. Williams, 504 Pa. 511, 475 A.2d 1283 (1984), abandoned the per se interested adult rule. Williams addressed a case in which a father was called to the police station, consulted with the child, and then the Miranda warnings were given to the child in the presence of his father. Although inapplicable to this case, I question the continued viability of Williams, though I leave that question for another day.
[6] I respectfully disagree with Justice Castille that R.H. was not subject to a custodial interrogation. Any reasonable high school student in the situation would have felt as though the questioning significantly restricted his or her freedom of movement or action.
[1] The dissents posit that there is no difference between school police officers and other school staff for Miranda purposes. As noted by the majority, however, pursuant to the authorizing statute school police officers may be vested with the full authority of municipal police officers, including the power of arrest. See 24 P.S. § 7-778. Indeed, at least one of the school police officers involved here possessed just such authorization. See In re Appointment of School Police Officer for the East Stroudsburg Area Sch. Dist., 4603 Misc. Civ.1998 (C.P. Monroe July 14, 1998). As Miranda's underlying concern is with the compulsion inherent in police custodial questioning, I find highly material the distinction between educators and those operating under color of police authority and possessing general police powers including the power of arrest.