J-S49038-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| TYLER SHANE VALENTINE, | |
| Appellee | No. 130 MDA 2015 |

Appeal from the Order Entered December 17, 2014
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0003448-2014

BEFORE:  BENDER, P.J.E., ALLEN AND OLSON, JJ.

MEMORANDUM BY OLSON, J.:                    **FILED SEPTEMBER 04, 2015**

The Commonwealth of Pennsylvania appeals as of right from the trial court's interlocutory December 17, 2014 order, granting the pre-trial motion to suppress evidence and granting, in part, the pre-trial motion to dismiss criminal charges that was filed by Tyler Shane Valentine (hereinafter "Mr. Valentine").  Our standard and scope of review demand that we affirm the trial court's order.

The affidavit of probable cause partially explains the underlying facts of this case.  We quote, in part, from the affidavit:

> On [February 13, 2014,] at [8:39 a.m.,] officers of the Southern Regional Police were dispatched to 31 East Franklin [Street] in New Freedom [B]orough . . . for a cardiac arrest of a [17-year-old] female, possible drug overdose.  Officers Heffner and Saylor responded.  Officers arrived at [8:55 a.m.] to find New Freedom Ambulance and EMS personnel on the scene providing emergency resuscitative measures to a [17-year-old] female that was

in [Mr. Valentine's] bedroom on the second floor of the residence. The female receiving the medical care was identified to be [Mr. Valentine's] [17-year-old] girlfriend, Alexandra Marie Sneed. . . . Officer noted a strong odor of marijuana coming from within [Mr. Valentine's] bedroom.

EMS was unable to resuscitate [Ms.] Sneed at the residence and transported her to York Hospital for further emergency resuscitative care. Shortly after [Ms.] Sneed's arrival at York Hospital, [Ms.] Sneed was pronounced dead at [9:47 a.m.] . . . . The York County [Coroners'] office was notified and Chief Deputy Coroner Stably responded to investigate [Ms.] Sneed's death.

On [February 17, 2014,] an autopsy was performed on [Ms.] Sneed's body. The results of the autopsy list cause of death as Mixed Substance Toxicity. As part of the autopsy[,] a drug toxicology was performed with the following results:

   Toxicology from femoral blood:
       1) Ethanol: none detected
       2) Total codeine: 28 ng/ml
       3) Total morphine: 1430 ng/ml
       4) Total hydromorphone: 6.5 ng/ml
       5) Alprazolam: 14 ng/ml
       6) Alpha-hydroxyalprazolam: none detected
       7) Delta-9-THC: none detected
       8) 11-Hydroxy-Delta-9-THC: none detected
       9) Carboxy-Delta-9-THC: 5.5 ng/ml

   Toxicology from vitreous fluid:
       1) [6-Monoacetylmorphine]: 22.6 ng/ml

Heroin metabolizes into morphine. [Ms.] Sneed's total morphine level was 1430 ng/ml. [6-Monoacetylmorphine] is only generated from heroin metabolism. [Ms.] Sneed's [6-Monoacetylmorphine] was 22.6 ng/ml which is indicative of heroin use. The carboxy-Delta-9-THC in [Ms.] Sneed's blood indicates that she had ingested marijuana. Along with [Ms.] Sneed's Alprazolam level of 14 ng/ml indicates that she ingested Xanax.

Written consent was obtained to search the residence including [Mr. Valentine's] bedroom. During the search of [Mr. Valentine's] bedroom [officers] discovered [Mr.] Valentine's blue and black snowboarding jacket in his closet. [Mr.] Valentine's jacket contained:

a) [Mr.] Valentine's wallet containing his license, money ($82.00), 10 plastic baggies[,] and spare batteries to the marijuana scale.

b) Digital marijuana scale mimicking an [iPhone 4].

c) 18.85 grams of marijuana (bud) triple bagged.

Affidavit of Probable Cause, dated 4/29/14, at 1-2 (some internal capitalization omitted).

The affidavit of probable cause continues by describing the results of an uncounseled and non-***Mirandized***[1] interview that occurred, at the South Regional Police station, between Mr. Valentine and members of the South Regional Police. The interview (and the circumstances surrounding the interview) later formed the basis for Mr. Valentine's pre-trial motion to suppress evidence and dismiss criminal charges. As Detective William Shafer averred in the affidavit of probable cause:

[On February 13, 2014] from [approximately 1:27 p.m. until 3:27 p.m.], I interviewed [18-year-old] [Mr.] Valentine. . . . During the interview, [Mr.] Valentine stated [that] he lives at 31 [East] Franklin [Street, in New Freedom, Pennsylvania]. He lives there with his mother, Dawn Felty. They are the only two people that live in the residence. His girlfriend is [17-year-old] Alexandra Marie Sneed. [Ms.] Sneed is a senior at Susquehannock High

---

[1] ***See Miranda v. Arizona***, 384 U.S. 436 (1966).

School. He's known [Ms.] Sneed for [approximately] four years and has been dating her for [approximately] two years. [Ms.] Sneed's parents are separated. Her father lives in New Freedom and her mother lives in Maryland Line. [Ms.] Sneed spends one week with her father and one week with her mother because of a custody agreement.

I asked [Mr.] Valentine about drug use. [Mr.] Valentine said they both smoke marijuana. They both are recreational users of heroin. [Mr.] Valentine said he was the one that introduced [Ms.] Sneed to heroin. They only snort the heroin. [Mr.] Valentine said [approximately] two years ago he was doing heroin. He cut off a little "bump" of heroin for [Ms.] Sneed and she tried it. [Ms.] Sneed liked it and has been using heroin ever since. [Mr.] Valentine said over the last two months he and [Ms.] Sneed have been using heroin at least weekly. [Ms.] Sneed's tolerance was increasing and she wanted it more and more. [Mr.] Valentine said he was trying to discourage her from using more and more heroin for fear that she would become dependent on heroin and start injecting it. [Mr.] Valentine said he had been in rehab before and didn't want [Ms.] Sneed to get to the point where she would need rehab.

I asked [Mr.] Valentine to walk me through the last [24] hours. He said that on [the morning of] Wednesday, [February 12, 2014, Ms.] Sneed's mother took her to school like always. [Ms.] Sneed leaves school at [noon] for senior release. He picked her up at school at [noon]. He drove her back to his residence. While at his house they smoked some marijuana that he had. [Ms.] Sneed worked at Taco Bell. She called Taco Bell and apparently her cash drawer from the night before was off by $4.00 and they told her she could come pick up her paycheck [as] she was being terminated. They stayed at his house until [approximately 8:30 p.m.] [Ms.] Sneed wanted some heroin. [Mr.] Valentine driving his car . . . drove [Ms.] Sneed to Northern Parkway in Baltimore City. It was just the two of them in the car. He bought three bags of heroin for them. He paid $50.00 for the heroin. He paid with his own money and the supplier gave the heroin to him. He drove them back to his house. They arrived back at his house at [approximately 10:30 p.m.]

[Mr.] Valentine said [approximately] an hour before they left to go to Baltimore for the heroin, [Ms.] Sneed took a 2 mg Xanax bar that she had. [Mr.] Valentine approximated the time to be [7:00 p.m.]

Once they returned from Baltimore . . . [Ms.] Sneed and [Mr.] Valentine went in his bedroom. They were watching a movie. [Mr.] Valentine took the three bags of heroin and dumped all of them into a dollar bill. He folded the dollar bill up and rubbed a lighter over the dollar bill to finely crush the heroin to prepare the heroin for "snorting," inhaling it through their nose. When he was done crushing the heroin up, he divided the heroin into two lines [approximately] two inches long and ¼ inch wide. He snorted one of the lines of heroin and [Ms.] Sneed snorted the other line of heroin that he prepared for her. They continued to watch the movie. [Ms.] Sneed was nodding off and he would occasionally wake her up. At [approximately] midnight [or 12:30 a.m.] they fell asleep on his bed. In the morning at approximately [8:00 a.m., h]e woke up and saw that [Ms.] Sneed looked pale and her lips were blue. He tried to wake her up[, however,] she would not wake up. He began to freak out and his mother came to see what was going on. [Ms.] Felty then pulled [Ms.] Sneed from the bed onto the floor and started CPR. [Mr.] Valentine called 911 from his cell phone.

Affidavit of Probable Cause, dated 4/29/14, at 2-3 (some internal capitalization omitted).

The police arrested Mr. Valentine on April 30, 2014 and the Commonwealth later charged him with drug delivery resulting in death, possession of heroin with the intent to deliver, possession of marijuana with

the intent to deliver, corruption of minors, and possession of drug paraphernalia.[2]

On August 5, 2014, Mr. Valentine filed a pre-trial motion to suppress evidence and dismiss criminal charges. Within Mr. Valentine's pre-trial motion, Mr. Valentine claimed that the trial court must suppress the oral and written statements he gave during the February 13, 2014 police station interview, as the police subjected him to a custodial interrogation without providing him with the requisite *Miranda* warnings. Mr. Valentine also claimed that the evidence the police retrieved from his cell phone must be suppressed because the police improperly searched his cell phone without consent or a search warrant and, even when the police obtained a search warrant to search his cell phone, the warrant was the fruit of the tainted confession he made to the police while in custody, without having been advised of his *Miranda* rights. Finally, Mr. Valentine claimed that the trial court must dismiss all of the charges against him since, in the absence of the challenged evidence, the Commonwealth cannot establish a *prima facie* case that he committed any crime. Mr. Valentine's Pre-Trial Motion, 8/5/14, at 1-6.

_____

[2] 18 Pa.C.S.A. § 2506(a), 35 P.S. § 780-113(a)(30), 35 P.S. § 780-113(a)(30), 18 Pa.C.S.A. § 6301(a)(1)(i), and 35 P.S. § 780-113(a)(32), respectively.

The trial court held a three-day hearing on Mr. Valentine's pre-trial motion, during which time the trial court viewed the entirety of Mr. Valentine's videotaped, February 13, 2014 police station interview. Further, during the hearing, the trial court heard testimony from Police Officer Paul Heffner, Detective William Shafer, and Mr. Valentine.

The videotaped, February 13, 2014 police station interview between Mr. Valentine and members of the South Regional Police reveals the following:

- At 1:24 p.m., Detective Shafer escorted Mr. Valentine into the South Regional Police station conference room. Mr. Valentine is unrestrained and wearing normal clothes and a baseball hat. Detective Shafer is dressed in plain clothes. The conference room is relatively large, with boxes in the corner, a whiteboard and framed documents on the walls, and audio-visual equipment, a computer, a typewriter, and small tables in various places in the room. In the middle of the room is a long, rectangular table, with six chairs on each of the two long sides. Mr. Valentine chose to sit in the chair that was closest to the single door in the room. The door itself has a wooden frame, but is mainly glass and looks out onto the police squad room. The recording camera is in the farthest corner of the room, diagonally from Mr. Valentine and the door.

- After showing Mr. Valentine into the conference room, Detective Shafer exited the room and slightly closed the door upon his exit. This left Mr. Valentine alone in the room, with the door still ajar.

- At 1:25 p.m., Police Officer Paul Heffner entered the room and gave Mr. Valentine a cup of water. Officer Heffner was uniformed and armed with a holstered firearm. While Mr. Valentine drank the water, Officer Heffner leaned against a side-table that was located a couple of feet away from the head of the large-rectangular table and began speaking with Mr. Valentine. The microphones were not yet activated and no audio exists of their conversation.

- At 1:26 p.m., Detective Shafer re-entered the room and activated the microphones by flipping a switch near the door. Detective Shafer then closed the door and sat down in a chair across from Mr. Valentine at the long-rectangular table. Specifically, Detective Shafer sat one-seat-down from being directly across from Mr. Valentine. Further, prior to sitting down, Detective Shafer offered the seat next to him, and directly across from Mr. Valentine, to Officer Heffner; Officer Heffner sat down in the chair that was next to Detective Shafer and directly across from Mr. Valentine.

- The following conversation then took place:

  Detective Shafer: Alright, Mr. Valentine, I'm Detective Shafer. [*Detective Shafer leans over the table and extends his hand to Mr. Valentine. Mr. Valentine and Detective Shafer shake hands.*] I'm with Southern Regional and you've met Officer, uh, Heffner. I'm sorry with what

happened. Uh, this obviously is a tragedy. Uh, we need to talk to you so we can get things ironed out. Um, so. We are being audio and visually recorded, just so you know that.

Mr. Valentine: Alright.

Detective Shafer: You are not under arrest. You can leave when you're done here. I am not keeping you and it doesn't matter what you say, I'm not keeping you. You've been cooperative. What we can work with this down the road, okay. I don't think you're, you know, a harm to yourself or anyone else right now, do you?

Mr. Valentine: [*shakes his head no and says something indistinct*]

Detective Shafter: So, I'm not, I'm not keeping you, okay. Just so you know that. I just – everyone thinks they come into a police station they're gonna be under arrest. That is not the case here. You are not – when we're done here you are going home, no matter what you say. Okay?

Mr. Valentine: Yeah. I'm just. I mean I'm still pretty –

Detective Shafer: Upset?

Mr. Valentine: Yeah.

Detective Shafer: I wouldn't expect anything less. Okay?

Mr. Valentine: Yeah.

Detective Shafer: So let me – let me start with – we didn't have a chance – we were busy – I mean, at your house. It's an ugly day. Uh, because we're being recorded, I want to get some voice on here so we can know who's who. Uh, it's now Thursday, February 13, 2014. The time is 1329 hours, or [1:29] in the afternoon. Um, [*speaking to Officer Heffner*] do you want to state who you are?

Officer Heffner: Yeah. Officer Paul Heffner. Southern Regional Police. Badge 1816.

Detective Shafer: And Mr. Valentine, can you give me your full name?

Mr. Valentine: Tyler J. Valentine.

. . .

Detective Shafer: Okay. We're going to keep this relatively informal. It's just – it's a tragedy. But we need to work through it, okay. Ah, so. What's your address?

- The interview then continued for approximately two hours. Through the vast majority of the interview, Detective Shafer and Officer Heffner sat across from Mr. Valentine, with Detective Shafer asking questions of Mr. Valentine and Mr. Valentine answering the questions. Further, while Detective Shafer and Officer Heffner left the room at various times during the interview, Mr. Valentine stayed in the room for the entire time, with the exception of leaving for a bathroom break towards the end of the interview – and Detective Shafer performed a limited pat-down of Mr. Valentine's person before he allowed Mr. Valentine to leave the room and go to the bathroom.

- During the interview, Mr. Valentine admitted to everything that Detective Shafer later recounted in the above-quoted affidavit of probable cause. The interview concluded at 3:27 p.m. and Mr. Valentine left the room.

- At no time prior to or during the interview did the police provide Mr. Valentine with **Miranda** warnings.

As noted above, during the three-day pre-trial motion hearing, the trial court not only viewed the videotaped, February 13, 2014 police interview, but the court also heard testimony from Officer Heffner, Detective Shafer, and Mr. Valentine. As is relevant to the current appeal, Detective Shafer and Mr. Valentine each testified as to: 1) how the police informed Mr. Valentine that he was requested (or required) to go to the police station on the afternoon of February 13, 2014; and 2) whether Mr. Valentine was free to leave the interview.

With respect to the first issue, Detective Shafer and Mr. Valentine provided differing accounts as to how the police informed Mr. Valentine to come to the police station on the afternoon of February 13, 2014 – and as to whether the police had requested or required Mr. Valentine's presence at the police station that afternoon. According to Detective Shafer, after the police finished their investigation at Mr. Valentine's house on the morning of February 13, 2014, the Chief of Police stayed at the house and "asked" Mr. Valentine to come to the station and speak with the police. Detective Shafer testified:

> Detective Shafer: Initially, the way he came down is he – when we left the scene [earlier that morning], we called [Mr. Valentine's mother] and said we were done so she could come home to her residence, and we obviously needed to talk to [Mr. Valentine] since [Ms.] Sneed was found dead in his bed.

- 11 -

So our chief stayed behind – when we talked to him, we found out he was with a friend in Glen Rock and was actually on his way back to the residence. We had no way of reaching him or communicating with him, so we left our chief behind, basically waited at the residence for Mr. Valentine to come home.

Once he came home, he was requested to come down to the police station so we could talk to him, and I received that phone call saying he was on his way down to the police station about 1:20 p.m., and about 1:25, Mr. Valentine arrived on station and his friend dropped him off.

. . .

Q: So [the chief] stayed behind at the residence, and his purpose was then to tell Tyler Valentine to go to the police station?

Detective Shafer: Not to tell him, but ask him to come down to talk to us.

N.T. Pre-Trial Motion Hearing, 8/26/14, at 24 and 36-37.

In contrast to the above testimony, Mr. Valentine testified that the police did not directly speak to him and that they did not merely request his presence at the station. Rather, according to Mr. Valentine, the police spoke to his mother and they told his mother that he "must go to the police station." As Mr. Valentine testified:

Q: And why did you go to the police station?

Mr. Valentine: I was told I must be – I must go to the police station.

The Court: Who told you that?

Mr. Valentine: The police told my mom.

- 12 -

The Court: Okay.

Q: And did you believe it was required of you to go to the police station?

Mr. Valentine: Yeah, I felt I had to be there.

. . .

Q: Mr. Valentine, I was trying to understand how you knew that the police officers wanted to talk to you. You said an officer told your mom?

Mr. Valentine: Yeah.

Q: Then your mom told you?

Mr. Valentine: Yes, sir.

Q: So you weren't told personally by any members of the police department that you were to go to the department?

Mr. Valentine: No, my mom told me that the police said I had to go down.

N.T. Pre-Trial Motion Hearing, 10/21/14, at 13-14 and 17.[3]

_____

[3] In summarizing the factual history of this case and in its argument section, the Commonwealth's brief states:

> The police also asked [Mr. Valentine's] mother to relay a message to [Mr. Valentine] that they would like to speak to him and wanted to know whether he would come down to the station to speak with them. [Mr. Valentine] acknowledged that he didn't get that request directly from a police officer, but claimed that his mother told him that he had to go down to the police station.

Commonwealth's Brief at 11 and 21 (internal citations omitted).

Thus, the Commonwealth's summary of the facts comports with Mr. Valentine's testimony, as opposed to Detective Shafer's testimony.

Regarding the issue of whether Mr. Valentine was in custody at the time of the interview, Detective Shafer testified that, even though he was investigating the matter as a crime, he did not possess a subjective desire to take Mr. Valentine into custody at the time of the interview. According to Detective Shafer:

> Q: So about what time did you decide it was a crime investigation?
>
> Detective Shafer: Probably about 9:50 when I received a little more information of what was going on and the outcome, but we didn't even know that she was dead yet at that time. We didn't know the outcome.
>
> Q: And then a little bit later that same morning, I think you have, like 10:03, is when you found out that the victim died?
>
> Detective Shafer: Yes. That's when I spoke to someone from the hospital and they informed me that she had been pronounced dead at that point.
>
> . . .
>
> Detective Shafer: . . . [At the time of the police station interview,] we had no interest in taking Mr. Valentine into custody at all. Again, we were in a [snow-related] state of emergency where we had to deal with a lot of other stuff with the snow. Even if we could have, we were going to – avoiding it early to – taking him into custody, because we had other issues we had to deal with.
>
> Q: At that time, were you aware of the circumstances of Alexandra Sneed's death?
>
> Detective Shafer: I was aware she was dead. I had no idea what the cause of death was. So, in reality, even if I wanted to, I couldn't arrest him for that, because we didn't know what the cause of death even was.

N.T. Pre-Trial Motion Hearing, 8/26/14, at 26-27 and 34-35.

However, Mr. Valentine testified that, during the police station interview, he did not believe that he was free to go and, further, that he believed he was required to provide the police with a statement before they would allow him to leave. Mr. Valentine testified:

> Q: And why did you give an oral statement [at the police station]?
>
> Mr. Valentine: I was told I could leave after I gave a statement.
>
> Q: Were you ever told that you were free to go at any time?
>
> Mr. Valentine: No, sir.
>
> Q: Did you believe that you were required to give a statement before you were able to leave the police station?
>
> Mr. Valentine: That's how I felt.
>
> Q: How did you feel about being in the room that was saw on the video?
>
> Mr. Valentine: I felt like I wasn't free to leave unless I gave a statement.
>
> Q: And how did you feel about the presence of the officers in the room?
>
> Mr. Valentine: I just felt like I had to be there, you know.
>
> . . .
>
> Q: Okay. Now, you said that you weren't told that you were free to leave?
>
> Mr. Valentine: I was told that I was free to leave after I was done there.

N.T. Pre-Trial Motion Hearing, 10/21/14, at 15 and 19.

On December 17, 2014, the trial court entered an order granting Mr. Valentine's motion to suppress the oral and written statements that Mr. Valentine provided during the February 13, 2014 police station interview and granting, in part, Mr. Valentine's motion to dismiss the criminal charges against him. With respect to the latter ruling, the trial court dismissed the drug delivery resulting in death and possession of heroin with the intent to deliver charges, but allowed the possession of marijuana with the intent to deliver, corruption of minors, and possession of drug paraphernalia charges to proceed.

As the trial court explained, its suppression ruling was mandated by its factual finding that, during the February 13, 2014 police station interview, Mr. Valentine reasonably believed that he was not free to leave and that he was required to provide the police with a statement. The trial court explained:

> I think if the plain meaning of words stated are, hey, yeah, you can go as soon as we are done here; yeah, you're going home after we are done here, clearly convey the message to [Mr. Valentine], you're not free to go until we are done here. I don't think there is any real question about that.
>
> . . .
>
> And simply to reiterate, shortly after [Mr. Valentine] arrived at the police station, he was sat down in a chair in a room. One officer sitting across from him said, "You're not under arrest. You can leave when you are done here." At a later point he said, "When you are done here, you are going home."

I think the plain language and plain meaning of those words are, you're free to go, but not until we are done here. Therefore, I am constrained to grant [Mr. Valentine's] request that statements he made during that custodial interrogation, after he was informed that he could leave when he was done, are suppressed and will not be admitted at trial.

N.T. Pre-Trial Motion Hearing, 12/17/14, at 7-8.[4]

_____

[4] We note that, during the pre-trial motion hearing, the assistant district attorney apparently conceded that a reasonable person in Mr. Valentine's position would not have felt as if he was free to leave the February 13, 2014 police station interview. This apparent concession is reflected in the following exchange that occurred between the trial court and the assistant district attorney:

Trial Court: Well, let me ask you this question, okay. Pretend that, in fact, the police have called you and asked you to stop by their office and they want to talk to you, and you know what it is about. You know that there [have] been allegations that you have been stealing beer from your neighbor's garage, and you know, or you suspect, that is probably what they are going to want to talk to you about.

So you go down to the police station, and they sit you down in the room and thank you for showing up. There happens to be another police officer in uniform armed standing by the door. The other police officer talking to you says, "Hey, by the way, when you are done here, you can leave. We are not going to keep you. When we are done here, you are going home." Would you believe, under those circumstances, that you were free to leave?

Assistant District Attorney: Well, I would. I would know that I am free to leave.

Trial Court: Is that because you happen to be a lawyer?

Assistant District Attorney: I have been practicing criminal law for several years.

*(Footnote Continued Next Page)*

Further, the trial court ordered that the evidence obtained as a result of the search of Mr. Valentine's cell phone must be suppressed, as the warrant to search the cell phone was based upon the tainted confession Mr. Valentine made to the police while in custody, without having been advised of his **Miranda** rights.

The Commonwealth filed a timely notice of appeal from the trial court's December 17, 2014 interlocutory order and properly certified that the trial court's order terminated or substantially handicapped its prosecution of Mr. Valentine. **See** Pa.R.A.P. 311(d). The Commonwealth raises three claims on appeal:

> [1.] Whether the [trial] court erred in granting suppression of statements made by [Mr. Valentine] based upon the erroneous legal conclusion that [Mr. Valentine] was subjected to a custodial police interrogation requiring **Miranda** warnings where [Mr. Valentine] voluntarily appeared at the police station to answer questions, was not

*(Footnote Continued)* ───────────────

> Trial Court: Do you think somebody who is not learned in the law would believe that they were free to leave under those circumstances?
>
> Assistant District Attorney: They might feel compelled to stay there under those circumstances.
>
> Trial Court: I agree, and that is what happened in this case. The police didn't do their job. They didn't inform [Mr. Valentine] of his **Miranda** rights, his right to remain silent, or his right to a lawyer before conducting [a] custodial interrogation of this [d]efendant.

N.T. Pre-Trial Motion Hearing, 12/17/14, at 4-5.

- 18 -

physically denied his freedom or placed in a situation where a reasonable person would have believed their movement was restricted?

[2.] Whether the [trial] court erred in granting [Mr. Valentine's] suppression motion where information included in the affidavit of probable cause submitted to secure the search warrant was not fruit of a poisonous tree and the affidavit contained sufficient facts to establish probable cause to believe evidence of a crime would be found in [Mr. Valentine's] phone records?

[3.] Whether the [trial] court erred in granting [Mr. Valentine's] pre-trial motion to dismiss drug delivery resulting in death and delivery of drug charges where the Commonwealth provided sufficient evidence at the *habeas corpus* hearing to establish a *prima facie* case of [Mr. Valentine's] guilt?

Commonwealth's Brief at 4 (some internal capitalization omitted).[5]

_____

[5] The trial court ordered the Commonwealth to file and serve a concise statement of errors complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).  The Commonwealth complied with the order and, within its Rule 1925(b) statement, the Commonwealth listed the following claims:

1. The trial court erred in granting [Mr. Valentine's] motion to suppress evidence.  Specifically, the trial court erred in finding that [Mr. Valentine] was subject to custodial interrogation without the benefit of **Miranda** warnings.  Under the totality of the circumstances, [Mr. Valentine] was not in custody at the time of his interview such that **Miranda** warnings were necessary.  Accordingly, the trial court erred in granting [Mr. Valentine's] suppression motion.

2. The trial court erred in suppressing evidence obtained from a cell phone pursuant to a search warrant.  The trial court found that obtained evidence was fruit from the poisonous tree as the search warrant contained information gleaned from [Mr. Valentine's] interview with the police.

*(Footnote Continued Next Page)*

The Commonwealth first claims that the trial court erred when it determined that Mr. Valentine was "in custody" during the February 13, 2014 police station interview. Based upon our standard and scope of review, we are constrained to conclude that this claim fails.

Initially, we outline our standard of review:

> When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an

*(Footnote Continued)* ————————

> However, as [Mr. Valentine] was not subject to a custodial interrogation, his statements should not have been suppressed. Accordingly, because the information contained within the search warrant was properly obtained, the resulting search warrant was properly issued and the evidence gathered as a result was not fruit from a poisonous tree. Therefore, the trial court erred in suppressing the resulting evidence.
>
> 3. The trial court erred in dismissing counts 1 and 2 of the criminal information for lack of evidence supporting a *prima facie* case. Because the statements made by [Mr. Valentine] during his interview and the evidence found on the [cell phone] are admissible, the Commonwealth presented sufficient *prima facie* [evidence] to support the charges. Accordingly, the trial court erred in dismissing counts 1 and 2 of the criminal information.

Commonwealth's Rule 1925(b) Statement, 2/5/15, at 1-2.

appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

***Commonwealth v. Kemp***, 961 A.2d 1247, 1252-1253 (Pa. Super. 2008) (*en banc*) (internal citations and quotations omitted). Where, as here, "the Commonwealth is appealing the adverse decision of a suppression court, a reviewing court must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted." ***Commonwealth v. James***, 486 A.2d 376, 379 (Pa. 1985) (internal citation omitted).

"To safeguard an uncounseled individual's Fifth Amendment privilege against self-incrimination, suspects subject to custodial interrogation by law enforcement officers must be warned that they have the right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney." ***In re R.H.***, 791 A.2d 331, 333 (Pa. 2002) (plurality); ***Miranda***, 384 U.S. at 444-445. "If a person is not advised of his ***Miranda*** rights prior to custodial interrogation by law enforcement officers, evidence resulting from such interrogation cannot be used against him." ***In re R.H.***, 791 A.2d at 333; ***Miranda***, 384 U.S. at 444-445. As this Court has summarized:

> The warnings articulated by [***Miranda***] become mandatory whenever one is subjected to custodial interrogation. The United States Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." [***Miranda***, 384 U.S. at 444-445].

> Police detentions only become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of formal arrest.
>
> Whether a person is in custody for ***Miranda*** purposes depends on whether the person is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes his freedom of action is being restricted.
>
> The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. The fact that a police investigation has focused on a particular individual does not automatically trigger "custody," thus requiring ***Miranda*** warnings.

***Commonwealth v. Baker***, 963 A.2d 495, 500-501 (some internal citations, quotations, and corrections omitted).

On appeal, the Commonwealth claims that the trial court erred when it concluded that, during the February 13, 2014 police station interview, Mr. Valentine was "in custody" for ***Miranda*** purposes. According to the Commonwealth, the record reveals that: Mr. Valentine was "free to leave when he wanted;" Mr. Valentine "voluntarily appeared at the police station;" the police did not "frisk[], search[,] or handcuff[]" Mr. Valentine prior to the interview; the room used to interview Mr. Valentine was "comfortably

spacious;" the interview lasted only two hours; "the tone of voices used by Detective Shafer and Officer Heffner were congenial and not hostile;" and, the officers "never brandished weapons or indicated that [Mr. Valentine] would be harmed if he did not choose to speak with them." Commonwealth's Brief at 26-27.

The Commonwealth's claim on appeal is contingent upon this Court viewing the evidence in the light most favorable to it. As was explained above, however, our scope of review requires that we "consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted." *James*, 486 A.2d at 379. Moreover, "[w]here the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." *Eichinger*, 915 A.2d at 1134.

Viewing the record under the proper standard and scope of review, we must conclude that the suppression court's ruling – that Mr. Valentine was "in custody" during the February 13, 2014 police station interview – is supported by the facts and the law.

At the outset, the trial court viewed the videotaped, February 13, 2014 police station interview and concluded that, when Detective Shafer told Mr. Valentine "[y]ou can leave when you're done here" and "when we're done here you are going home," a reasonable person in Mr. Valentine's position would have believed that he was not permitted to leave until he answered all

of Detective Shafer's questions. Thus, the trial court concluded that a reasonable person in Mr. Valentine's position would have believed that he was not "free to leave" during the interview. As the trial court explained:

> shortly after [Mr. Valentine] arrived at the police station, he was sat down in a chair in a room. [Detective Shafer then] said, "You're not under arrest. **You can leave when you are done here**." At a later point he said, "**When you are done here**, you are going home."
>
> I think the plain language and plain meaning of those words are, you're free to go, **but not until we are done here**.

N.T. Pre-Trial Motion Hearing, 12/17/14, at 7-8 (emphasis added).

Simply stated, the trial court's factual interpretation of Detective Shafer's words is supported by the evidence. As such, we are bound by this factual finding. Given that we are bound by the trial court's specific factual interpretation of Detective Shafer's language, we must conclude that the trial court was correct when it determined that a reasonable person in Mr. Valentine's position would not have believed that he was "free to leave" during the police station interview – and that he could not leave until he answered the questions that the police posed to him. To be sure, the trial court's factual interpretation of Detective Shafer's words means that, when Detective Shafer told Mr. Valentine "[y]ou can leave when you're done here" and "when we're done here you are going home," Detective Shafer really told Mr. Valentine "you're free to go, **but not until we are done here**." *See* N.T. Pre-Trial Motion Hearing, 12/17/14, at 7-8 (emphasis added).

The Commonwealth's claim that Mr. Valentine was "free to leave when he wanted" ignores our standard of review and is, therefore, meritless.  ***See Commonwealth v. Mistler***, 912 A.2d 1265, 1269 ("Where the record supports the factual findings of the suppression court, **we are bound by those facts** and may reverse only if the legal conclusions drawn therefrom are in error") (emphasis added); ***Commonwealth v. Bomar***, 826 A.2d 831, 846 (Pa. 2003) (holding that when the trial court's "findings of fact are supported by the record . . . **they may not be disturbed on appeal**") (emphasis added).  The claim thus fails.

Further, after viewing "the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted," we conclude that the totality of the circumstances supports the trial court's conclusion that, during the February 13, 2014 police station interview, Mr. Valentine was "in custody" for ***Miranda*** purposes.  Indeed, after employing the proper standard and scope of review, the record reveals that:  1) on the afternoon of February 13, 2014, Mr. Valentine did not voluntarily go to the police station in response to a police invitation – instead, Mr. Valentine went to the station that day because the police told his mother that he "**had to go down**" to the station, thus indicating that the police informed Mr. Valentine's mother that Mr. Valentine had no choice but to go to the police station that afternoon; 2) earlier in the morning, the police demonstrated that they were investigating Ms. Sneed's death as a crime and, given that Ms. Sneed died in

Mr. Valentine's bed, a reasonable person in Mr. Valentine's position would have been aware that he was a suspect in Ms. Sneed's death; 3) earlier in the morning, the police seized marijuana and drug packaging paraphernalia from Mr. Valentine's coat and, therefore, prior to Mr. Valentine's arrival at the police station, Mr. Valentine was aware that he already committed an arrestable offense; 4) the interview occurred at the police station, behind a closed door, and in the presence of an armed police officer – and, thus, the atmosphere of the interview was unquestionably "police-dominated;" and, 5) the interview was two hours long and, although Detective Shafer and Officer Heffner left the room at various times during the interview, Mr. Valentine stayed in the room for the entire time, with the exception of leaving for one bathroom break towards the end of the interview – and Detective Shafer performed a limited pat-down of Mr. Valentine's person before he allowed Mr. Valentine to leave the room and go to the bathroom.

Given our standard and scope of review, we conclude that, under the totality of the circumstances, a reasonable person in Mr. Valentine's position would not have believed that he was free to terminate the February 13, 2014 police station interview and leave the station until he finished answering Detective Shafer's questions. Therefore, we agree with the trial court that the February 13, 2014 police station interview constituted a custodial interrogation and the statements Mr. Valentine made during that interrogation must be suppressed. The Commonwealth's claim to the contrary fails.

With respect to the Commonwealth's second and third claims on appeal, the Commonwealth has made their success contingent upon this Court accepting its first argument and concluding that the trial court erred when it held that Mr. Valentine was "in custody" during the February 13, 2014 police station interview. *See* Commonwealth's Brief at 27-28 and 32-33; *see also* Commonwealth's Rule 1925(b) Statement, 2/5/15, at 1-2. However, we concluded that the trial court correctly held that the police subjected Mr. Valentine to a custodial interrogation on February 13, 2014 and, thus, the trial court properly suppressed the statements Mr. Valentine made during the custodial interrogation. Therefore, the Commonwealth's second and third claims on appeal logically fail.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/4/2015